Filed 8/17/22  Arthur v. Dallaswhite Corp. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| BRIDGET ARTHUR, as Personal Representative, etc., | D078842 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CIVDS1801578) |
| DALLASWHITE CORPORATION, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, David S. Cohn, Judge.  Affirmed in part; denied in part.

Von Esch Law Group, Robert Alexander Von Esch IV and David V. Luu for Defendant and Appellant.

Law Offices of Price K. Kent, Price K. Kent; Lack Law Group and Rebecca D. Lack; Law Office of Mark A. Padilla and Mark A. Padilla for Plaintiff and Respondent.

Defendant Dallaswhite Corporation (Dallaswhite) appeals the judgment for Mary Mowbray (Mary),[1] following a bench trial in which the court found Dallaswhite breached the parties' written home repair construction contract. The court, after making various setoffs, awarded Mary compensatory damages of $16,803.57.

For reasons we explain, we conclude the court erred in applying the collateral source rule, thereby failing to reduce Mary's damages by an additional $5,675.49, based on a payment she and her late husband Edward Mowbray (Edward) retained from their insurer. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### *Overview*

The history of this case is multifaceted. Accordingly, we begin with an overview of the litigation to provide context for our discussion of the issues on appeal.

---

[1]    Because other witnesses share the same last name as Mary, we will refer to her and those witnesses by their first name. Prior to oral argument, this court was notified that Mary passed away while the appeal was pending. On August 10, 2022, we granted an unopposed motion to substitute personal representative Bridget Arthur, Mary's adult daughter, for the decedent. (See Code of Civ. Proc., § 377.31 ["On motion after the death of a person who commenced an action or proceeding, the court shall allow a pending action or proceeding that does not abate to be continued by the decedent's personal representative or, if none, by the decedent's successor in interest."]; Cal. Rules of Court, rule 8.36(a) ["Substitution of parties in an appeal or original proceeding must be made by serving and filing a motion in the reviewing court. The clerk of that court must notify the superior court of any ruling on the motion."].)

[2]    We grant Mary's July 19, 2021 opposed request to augment the record on appeal, including the additional documents she submitted for augmentation on September 13, 2021.

Mary and Edward (sometimes, the Mowbrays) were the sole trustees and beneficiaries of the Mowbray family trust, which held title to a Big Bear Lake cabin they mostly used as a rental property (Subject Property). On August 9, 2012, a fire damaged the Subject Property. Because Mary and Edward were both in their late 80's and did not live in Big Bear, they gave their adult son Patrick Mowbray (Patrick) a valid power of attorney (POA) to "handle all decisions, transactions and claims in relation to the management, rental, demolition, repairs and/or reconstruction" of the Subject Property.

The Mowbrays submitted an insurance claim to Farmers Fire Insurance Exchange (Farmers) for the fire damage. On August 31, 2012, Farmers provided an estimate of damages and a scope of repairs. The insured loss totaled $72,142.50.

About a month later, Patrick entered into the home repair construction contract with Dallaswhite. The amount due under the original contract matched the loss estimated by Farmers. Although signed in late September 2012, Dallaswhite did not begin work on the Project for another nine months.

On June 20, 2013, Dallaswhite prepared a scope of work designated by the parties as "R-3," to reflect that it was the *third* version to two earlier draft scopes of work that the parties never adopted. R-3 included upgrades to the Subject Property made by Patrick beyond the fire damage covered by Farmers. These upgrades were memorialized in a change order signed by Patrick and a Dallaswhite Project manager. Over the next couple months, other changes were made to R-3 that also were memorialized in change orders signed by the parties. Near the end of August 2013, the new contract totaled $110,237.91.

In mid-November 2013, Patrick left Big Bear, where he had been temporarily living to manage the Project, and returned to his parents' Orange

3

County home.  Around this time, Patrick ceased his involvement in the Project for a "period of time."

At about this same time, Mary became very ill with shingles and Edward on or about November 20, 2013 entered the hospital, where he remained for about a week and, upon his discharge, spent another week in aftercare for additional treatment.  When Edward returned home, he was not well and needed a caregiver, as Mary was still too ill to care for him.

The Mowbrays' adult daughter Bridget Arthur (Arthur) on November 24 emailed Dallaswhite's president and owner, Brian Whiteway (Whiteway), informing him of her parents' illnesses and of Patrick's absence.  In this email, Arthur claimed her brother allegedly had "relapse[d] in his drinking problem"; that, because he allegedly refused to leave their parents' home, she had obtained a temporary restraining order against him; and that she was taking "charge" of the Project and it was her "wish" to "put this house back together as a rental, not a 5 star resort like Pat wanted."

About an hour later, Whiteway emailed Arthur, stating he was looking forward to working with her to complete the Project, but needed "a copy of the power of attorney ASAP so we can take directive from you moving forward." That same evening, Arthur and Whiteway spoke by telephone.  Whiteway informed Arthur that Dallaswhite was assigning Kent Riehm (Riehm) as the new (and third) Project manager.  Arthur thereafter took over the management of the Project and modified R-3 by downgrading the Project in several respects.  She did so without a power of attorney.

In mid-January 2014, Edward gave Riehm a cashier's check for $13,841.46.  Edward believed this was the final payment due under the contract.

4

On January 30, 2014, Arthur drove Edward to Big Bear. They, along with Riehm and a few others, conducted a "walk-through" of the Subject Property. At the completion of the walk-through, Edward signed a Certificate of Completion and Satisfaction (Certificate of Completion) providing he had reviewed, and was satisfied with, the work performed by Dallaswhite.

On or about March 6, 2014, Dallaswhite sent an invoice to the Mowbrays demanding payment of $5,675.49, after Dallaswhite had billed Farmers in this amount for additional costs it incurred on the Project (March 2014 Supplemental Invoice). Farmers approved the March 2014 Supplemental Invoice, but paid the money directly to the Mowbrays.

In August 2014, Dallaswhite sued Edward (but not Mary) in small claims court, seeking what was then the jurisdictional limit of $5,000, after the Mowbrays refused to turn over any of the additional money they had received from Farmers. Dallaswhite succeeded in small claims court. Edward, however, appealed, leading to a trial de novo in April 2015 in which Edward prevailed (as discussed *post*). Shortly thereafter, Edward died.

In January 2018, Mary filed the lawsuit that is the subject of this appeal. She alleged a single cause of action against Dallaswhite for breach of contract. In September 2018, Mary amended her complaint to add causes of action against Dallaswhite for breach of warranty, negligence, and financial elder abuse.

5

### *The Construction Contract*

Section 6 of the parties' contract governed "changes" to the "Work" to be performed by Dallaswhite.[3] It provides in part: "Owner may make changes in the Work. Owner and DALLASWHITE must agree, in writing, to the scope of the changed work, the price of the changed work, any effect on any payment terms or conditions, including the timing of payments and the time necessary to complete the changed work ('Change order'). Any Change Order shall be executed in the form attached hereto as Exhibit 'B.' "

On June 20, 2013, Dallaswhite prepared scope of work "R-3," incorporating the renovations and improvements made by Patrick. R-3 became part of the contract by virtue of Change Orders 1 and 3, the latter of which Patrick signed on June 27, 2013 as his parents' POA.[4] R-3 increased the cost of the Project to $95,579.20, or $23,436.70 above the original contract price.

Change Order 4, dated July 12, 2013, increased the contract price by an additional $1,500. Under this change order, Dallaswhite agreed to additional renovations to the Subject Property including dropping the "ceiling in the kitchen for hood vent install[ation]." Patrick also signed Change Order 4 in his capacity as POA.

The parties executed Change Order 5 on August 20, 2013. This change order was for a roofing upgrade to the Subject Property required by the City

---

[3] "Work" is defined in Section 1 of the contract to mean "all labor, materials, equipment, supervision and contract administration to restore the Property to its original condition immediately prior to the loss giving rise to the Claim using like kind and quality of labor and materials."

[4] Change Order 2 was filled out but never signed by the parties.

of Big Bear.  Change Order 5 increased the contract by $13,161.71, for a new total of $110,237.91.

Josh Gonzalez (Gonzalez) was Dallaswhite's Project manager when Change Orders 1 and 3 were executed.  Change Orders 4 and 5 were submitted and signed on behalf of Dallaswhite by Preston Brant (Brant), who replaced Gonzalez as Project manager.  Brant left Dallaswhite toward the end of 2013, after he became "frustrate[ed]" and experienced "problems" on "every" Dallaswhite project.

### *Trial De Novo*

Edward's appeal of the small claims case was heard on April 21, 2015 by San Bernardino Superior Court Judge Larry W. Allen.  (See *Dallaswhite Corporation v. Mowbray*, San Bernardino County Superior Court case No. SMCVS1401539 (Trial De Novo).)  Edward was represented by legal counsel, while Riehm alone appeared on behalf of Dallaswhite.  Patrick, Edward, Mary and Riehm all testified at the Trial De Novo, and multiple exhibits were admitted during the proceeding.

In his opening statement, Riehm argued the case was limited to the single issue of whether Dallaswhite was entitled to $5,000 of the $5,675.49 the Mowbrays had received from Farmers.  Edward (through counsel) argued the scope of the Trial De Novo included whether the Mowbrays were entitled to claim offsets to any money allegedly owed Dallaswhite, based on Dallaswhite's performance (or lack thereof) of the contract.

In support, Edward informed Judge Allen the Mowbrays had filed a complaint against Dallaswhite with the Contractors State License Board (CSLB); that CSLB investigator David Spiegel (Spiegel) had personally inspected the Subject Property and had prepared a detailed report dated October 26, 2014 summarizing his findings; and that Spiegel concluded

7

Dallaswhite's work fell below the "accepted trade standards for goods and workman-like construction," and estimated the "cost to correct the work" at $25,651.89. Edward informed Judge Allen they intended to file a separate lawsuit (i.e., the instant case) against Dallaswhite for breach of contract.

It was then Judge Allen stated, "Well, Mr. Riehm, from what little I know of the case, you should pause now and think about this. And I say—this is entirely up to you." Judge Allen explained that, because it appeared additional litigation involving the Project was likely, Riehm should consider whether it was in Dallaswhite's best interest to proceed with the Trial De Novo, given the Mowbrays were entitled to "claim offsets" to any payment allegedly owed Dallaswhite. Riehm indicated he wanted to go forward with the case, to which Judge Allen responded, "That's fine."

**Patrick's Testimony**

Patrick signed the original contract with Dallaswhite on September 29, 2012. On or about June 4, 2013, Patrick emailed Dallaswhite, after learning Gonzalez had obtained a check directly from Mary. Patrick wrote that, going forward, Dallaswhite was not to contact Mary and Edward because they did not " 'want any more involvement' " in the Project. Whiteway responded, " 'Pat, thank you for your correspondence. Moving forward we will correspond and deal directly with you as we have from the beginning.' " Patrick explained to Judge Allen that, while Mary held the "checkbook," he was running the "job."

Patrick communicated with Gonzalez, the first Project manager, on "almost . . . a daily basis." Patrick complained to Gonzalez about the Project's long delay, testifying at one point he emailed Gonzalez that a claims adjuster from Farmers had been "amazed" the Project was still ongoing.

Patrick emailed Gonzalez on June 18, 2013, identifying by model number the upgraded appliances he had chosen for installation in the kitchen. On or about June 20, 2013, these model numbers were incorporated into R-3 and became part of the contract as a result of Change Orders 1 and 3. While on the witness stand, Patrick reviewed pictures of the various upgraded kitchen appliances that were included in R-3, and compared them to what he described as the substandard, "terrible" appliances Dallaswhite instead had installed as substitutes in the Subject Property.

At some point, Patrick learned Brant had replaced Gonzalez as the Project manager. Patrick testified that he also communicated with Brant regarding the Project almost "daily"; and that at one point the two of them had gone "shopping" to multiple stores over about a three-day period, identifying additional items for installation in the Subject Property. Patrick testified Dallaswhite did not install these additional items, however, based on changes to R-3 made by Arthur.[5]

As noted, Riehm replaced Brant as the Project manager in late November 2013. However, unlike Dallaswhite's previous Project managers, Patrick had no communication with Riehm. Patrick told Judge Allen that, as of November 2013, he had been working for about 15 months on a Project that was supposed to have taken only four; that he needed to return to Orange County for some medical tests he had postponed due to his involvement in the Project; and that when he left Big Bear, he had identified

_____

[5] By way of example only, Dallaswhite installed what Patrick claimed was an "absolutely useless" 17-inch dishwasher in the kitchen in lieu of a full-size, 24-inch dishwasher; four-feet of kitchen cabinets made of melamine in place of 16 feet of wooden cabinets he and Brant had chosen; and carpet in the downstairs living room instead of the laminate flooring they also had chosen.

9

and communicated to Dallaswhite, through its Project managers Gonzalez and Brant *and* its owner Whiteway, "97 percent of everything" required to be installed under R-3 and the various change orders.

Patrick denied having a "drinking problem" as Arthur claimed in her November 24 email to Whiteway. He also denied a restraining order was issued against him, as Arthur also claimed in that email.[6]

**Edward's Testimony**

Edward testified that on or about January 17, 2014, Riehm came to the Mowbrays' home in Orange County to obtain a cashier's check made payable to Dallaswhite. At the time, Riehm "assured"—and then "reassured"—Edward that after this payment, Dallaswhite was owed no additional money under the contract. Prior to making what Edward believed was this final payment, Riehm had threatened to sue the Mowbrays and "destroy" their credit.

Edward was questioned about the Certificate of Completion he signed on January 30, 2014. Edward told Judge Allen that he was unaware of the terms of the contract when he signed the document, including the upgrades Patrick had negotiated and the Mowbrays had paid for as provided in R-3 and the change orders; and that he had been unable to "give a good inspection of the work" done by Dallaswhite because he was physically "incapacit[ated]" and unable to climb the stairs to the second floor.

Edward was asked about Riehm's statements that the Mowbrays had given Arthur the authority to modify R-3. Edward denied giving his

---

6    We note the record does not include a copy of any restraining order issued against Patrick, or any paperwork to support such an order. At trial, Arthur testified a *temporary* restraining order did issue against Patrick but the court subsequently refused to make the order permanent.

10

daughter such authority. On cross-examination, Edward reiterated that he never told Riehm (his cross-examiner) that Dallaswhite was to follow the "directives" of Arthur after November 2013. Edward also testified that Patrick and not Arthur was in charge of the Project throughout the contract, and that Dallaswhite should have taken direction from Patrick to complete the Project.

**Additional Witness Testimony**

Mary also testified at the Trial De Novo, as did Riehm on behalf of Dallaswhite. Like her husband, Mary testified Arthur had no "authority" to modify the Project, and disputed that she and Edward had orally confirmed in a meeting with Riehm that Dallaswhite could take direction from Arthur.

Riehm in his testimony accused both Mary and Edward of "lying" about Arthur's lack of authority to modify R-3, claiming he had their "word" she was in charge of the Project. Judge Allen assured Riehm he understood Dallaswhite's position in the case, and recognized the evidence was conflicting on this point.

On cross-examination, Riehm admitted that, once Arthur took over the Project, none of the changes to R-3 were in writing. He also admitted Dallaswhite allowed modifications to the Project despite Arthur's lack of a power of attorney, testifying Dallaswhite had "asked for one though."

**Judge Allen's Ruling**

At the end of the trial, Judge Allen from the bench ruled for Edward, finding Dallaswhite was not owed any additional money under the contract. A judgment was entered for Edward on July 23, 2015, which included an award of $9.085.21 for his costs and attorney fees.

### *Instant Lawsuit*

Mary filed this lawsuit against Dallaswhite on January 22, 2018, seeking breach of contract damages of $57,250. Mary also requested the court award her attorney fees and costs as provided in Section 12 of the contract.[7] Mary amended her complaint in September 2018, and, in addition to general and special damages, sought punitive damages against Dallaswhite under Welfare and Institutions Code section 15600 et seq. In November 2018, Dallaswhite answered the FAC, asserting myriad affirmative defenses.

As discussed in more detail *post*, in late April 2019 Dallaswhite moved ex parte to file what it claimed was a compulsory cross-complaint against Arthur. Dallaswhite argued it was unaware Mary was disputing Arthur's authority to modify R-3 until it received Mary's discovery responses earlier that month. The court declined to grant Dallaswhite's motion on an expedited basis, and at a subsequent hearing denied the motion.

In motions in limine, the court ruled to admit the transcript of, and the exhibits introduced during, the (April 2015) Trial De Novo. At the same time, the court ruled issue preclusion did not prevent Dallaswhite from relitigating issues decided against it during that proceeding.

The instant case came on for a bench trial in September 2019. Multiple witnesses testified at the trial including Mary, who was then about 93 years

---

[7] Section 12 provides in part: "The prevailing party in any action to enforce this Contract or interpret its terms shall be entitled to an award of all of its 'costs,' with 'costs' being defined as including attorney's fees, expert and consultant fees and other costs of litigation, including costs on appeal."

old, Arthur, Riehm, Whiteway and two experts called by Mary.[8] The court also considered the witness testimony from the Trial De Novo (including from Patrick and Edward, who were both deceased), and the exhibits admitted in that proceeding.

There were two main issues at trial: (1) identifying the correct version of the scope of work between the parties; and (2) whether Arthur was an agent of her parents, and thus, had the legal authority to modify the Project after she took over for Patrick. In response to these two issues, the court in its lengthy statement of decision, as revised (SOD), found that R-3 was the scope of work governing the Project; and that the "evidence" did *not* support a finding Arthur was her parents' agent.

The court also found that Dallaswhite failed to fulfill its obligations under the contract "in three general areas," resulting in damages to Mary. First, Dallaswhite failed to provide certain items called for in R-3, "either because Dallaswhite provided the lower-cost items that Ms. Arthur orally requested instead of those specified in R-3, or because Dallaswhite simply failed to provide the specified item at all." Second, Dallaswhite's quality of work was "substandard in numerous respects." And third, R-3 contained "minor duplications."

As noted, the court—after making various offsets (discussed *post*)— awarded Mary compensatory damages of $16,803.57. The court also found Mary's breach of warranty claim duplicative of her breach of contract claim; and found against her on her negligence and financial elder abuse claims.

---

8    Relevant portions of the witness testimony will be discussed *post*, in connection with the issues raised on appeal.

13

The SOD provided attorney fees would be "addressed in subsequent proceedings."[9]

On appeal, Dallaswhite does *not* challenge the finding that R-3 was the parties' agreed-to scope of work. Instead, it primarily focuses on the court's agency finding, arguing that "substantial evidence" supports a finding Arthur was in fact her parents' agent; and therefore, that she had the legal authority to modify R-3 and downgrade the Project. Based on this *new* finding of agency in its favor, Dallaswhite then makes a series of legal arguments to support reversal of the judgment. Alternatively, it contends the court erred in refusing to make additional offsets to Mary's damage award.

## DISCUSSION

### I. *R-3 Establishes the Scope of Work*

We first address the court's finding that R-3 governed the parties' scope of work of the Project, as this issue has significance on others raised by Dallaswhite in this case.

During discovery (in the instant case), Dallaswhite produced what the parties and the court referred to as Exhibits 27 and 28. Exhibit 27 is a change order, designated as Change Order 6 purportedly signed by Edward on January 16, 2014, implementing Exhibit 28, an amended scope of work designated as R-4. R-4 (1) shows the downgrades to the Project directed by Arthur and (2) states a lowered contract price of $104,603.80. Whiteway at trial testified R-4 reduced to writing *all* the oral modifications to R-3 made by Arthur and Dallaswhite.

---

9      Other than Dallaswhite seeking a reversal of the judgment, the parties have not addressed on appeal the issue of entitlement to, and/or any award of, attorney fees and costs.

14

The court, however, found "convincing," "uncontroverted" evidence that Edward's signature on Change Order 6 was forged. The court relied on the testimony of Mike Wakshull (Wakshull), an expert "document examiner" retained by Mary, whom the court found to be "highly credible." Based on his review of six of Edward's signatures, Wakshull testified Edward's signature on Change Order 6 was a " 'replica,' " which Wakshull defined as a "digital 'cut and paste' of a 'known' authentic signature."

The court next addressed the question of "who" forged the signature, "when, and why."

It found Dallaswhite never presented Change Order 6 in either the small claims case or the subsequent Trial Do Novo, to show "documentation for the downgrades." The court found "credible" Whiteway's denial that neither he, nor someone at his direction from Dallaswhite, forged Edward's signature to "establish a false defense" to Mary's lawsuit. Instead, it found the more "plausible explanation" was that Riehm forged Edward's signature, "perhaps when he realized he had neglected to obtain a signed change order for the downgrades selected by Ms. Arthur." The court based this finding on Riehm's "credibility as a witness," and its observation his "work was sloppy."

Regardless of who at Dallaswhite committed the forgery, the court found "[s]omeone, acting on behalf of Dallaswhite, created the forged

15

document."[10]  The court thus found R-3 represented the scope of work agreed to by the parties, with a contract price of $110,237.91.

## II. Authority to Modify R-3

### A. *Agency*

Turning to the main issue in this case, Dallaswhite contends the court erred in concluding the evidence did not support a finding of agency in its favor.[11]  Dallaswhite initially contends the court's reasoning on agency is

---

[10]  The court raised the possibility that Arthur may have forged Edward's signature on Change Order 6 "rather than troubling him to obtain it."  However, the court found no evidence to support "this speculation," other than the fact Arthur's relationship with her parents was "strained."  Moreover, the court noted that, *if* Arthur had forged her father's signature on Change Order 6, Dallaswhite "surely" would have produced this document during the CSLB investigation and/or in connection with the small claims action and/or the Trial De Novo.  It thus rejected the possibility it was Arthur that had forged her father's signature on Change Order 6.

[11]  We note that at various points in its brief, Dallaswhite argues an agency relationship existed between Arthur and both her parents (Appellant's Opening Brief (AOB), at p. 20 ["[T]he Trial Court erred in ruling in Plaintiffs' favor despite the substantial evidence of [Arthur's] legal authority to modify the contract as the *Mowbrays'* agent" (italics added)]); between her and Edward only (*id.* at p. 21 ["Edward was never prevented from acting on his own behalf, nor did he lack the power to have *Bridget [Arthur] act as his agent*" (italics added)]); and between her and Mary (*id.* at p. 24 ["At trial, [Arthur] further testified the [November 24] email [to Whiteway] was read to Mary before being sent.  The only reasonable conclusion is that Plaintiff knew, had no objections to, and agreed with *Bridget [Arthur]* taking control over the project and advising Dallaswhite of the same.  This is substantial evidence of the *agency relationship . . . .*" (Italics added.)].)  Neither party on appeal raises the issue of whether Arthur, *if* the agent of one but not both her parents, could legally act on their behalf, given the Mowbrays' family trust held title to the Subject Property, with Mary and Edward as its sole trustees and beneficiaries.  Because substantial evidence supports the finding Arthur was not the agent of either of her parents, we deem it unnecessary to address this issue.

incorrect as a matter of law because the court in its SOD allegedly ruled Arthur could not be her parents' agent simply because she, unlike Patrick, did not have a power of attorney. Dallaswhite is mistaken.

### 1. The Court's Agency Finding Was Based on the Evidence

In reviewing the SOD, it is clear the court did not rest its agency decision solely on whether Arthur was acting under a power of attorney. Of course, *if* Arthur had received a valid power of attorney like her brother, there is no question she would have been the attorney-in-fact, or agent, of her parents, the principals, with the authority to manage the Project and modify R-3 as provided under Section 6. (See Prob. Code, §§ 4401, 4402.)[12] It was precisely for this reason Whiteway responded to Arthur's November 24 email by requesting a power of attorney "ASAP."

Contrary to Dallaswhite's argument on appeal, the SOD shows the court found the "evidence" in this case did not "support a finding of agency." We recognize the court did not expressly state in its SOD the evidence on which it relied to support this finding. Nonetheless, based on our review of the record and as we discuss, we find more than sufficient evidence in the record to support this finding. (See *Brewer v. Murphy* (2008) 161 Cal.App.4th

---

[12] Probate Code section 4401 is the "statutory form power of attorney" that is legally sufficient when the requirements of section 4402 of the Probate Code are met. Pursuant to Probate Code section 4402, a statutory form power of attorney is "legally sufficient" if (a) the wording of the form "complies substantially" with Probate Code section 4401; (b) the "form is properly completed"; and (c) the "signature of the principal is acknowledged."

17

928, 935-936 (*Brewer*) [evidence is " 'substantial' " "if it is 'of "ponderable legal significance," "reasonable in nature, credible, and of solid value" ' "].)[13]

In addition, the SOD makes clear the court's agency finding arose as a result of credibility determinations it made as trier of fact. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*) [the "fact finder's determination of the veracity of a witness is final"]; *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 (*Cuiellette*) [" '[w]e may not reweigh the evidence and are bound by the trial court's credibility determinations' "]; *Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970 (*Pescosolido*) [the court as the trier of fact "is the sole judge of the credibility of the witnesses"].)

We therefore reject Dallaswhite's contention the court allegedly based its decision that Arthur was not an agent of her parents solely on the fact she lacked a power of attorney.

### 2. Dallaswhite Has Failed to Establish Arthur's Agency as a Matter of Law

#### a. *Standard of Review and Burden of Proof*

The existence of an agency relationship is a factual question for the trier of fact. (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619); *Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780 (*Inglewood*) ["Generally, the existence of an agency relationship and

---

[13]    As pointed out by Mary in her Respondent's Brief, Dallaswhite in its AOB omitted substantial portions of the evidence supporting the court's no agency finding, including evidence from the Trial De Novo summarized *ante*. (See Cal. Rules of Court, rule 8.204(a)(2)(C) [requiring a party to "provide a summary of the significant facts limited to matters in the record"]; see also *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 [recognizing a " 'party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*' "].)

the extent of the authority of an agent are questions of fact, and the burden of proving agency, as well as the scope of the agent's authority, rests upon the party asserting the existence of the agency and seeking to charge the principal with the representation of the agent"].) " 'The law indulges in no presumption that an agency exists, but instead presumes that a person is acting for himself and not as agent for another.' " (*K. King & G. Shuler Corp. v. King* (1968) 259 Cal.App.2d 383, 393.)

" 'In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." [Citations.] Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law.*" [Citation.] Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' [Citation.] This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing [party] to meet, because unless the trier of fact made specific factual findings in favor of the losing [party], we presume the trier of fact concluded that '[the party's] evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 (*Estes*), citing *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163-164 and *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

Here, the court ruled Dallaswhite did not carry *its* evidentiary burden to show Arthur was the agent of her parents. (See *Inglewood*, *supra*,

19

227 Cal.App.3d at p. 780; see also *J.M. Wildman, Inc. v. Stults* (1959) 176 Cal.App.2d 670, 674 [the burden of proof to establish agency "rests with the party asserting that the agent had authority to enter into the contract"].) We therefore apply the standard set forth in *Estes* in determining whether, on appeal, the evidence compels a finding of agency in Dallaswhite's favor.

### b. *Agency Principles*

"An agent is one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.)[14] Agency is "either actual or ostensible." (§ 2298.) An agency is "actual" "when the agent is really employed by the principal." (§ 2299.) Actual authority "is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." (§ 2316.)

An agency is "ostensible" "when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (§ 2300.) "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (§ 2317.)

### c. *Analysis*

Dallaswhite contends there was "substantial evidence" of an "agency relationship" that allegedly was "never addressed" by the court in its SOD. According to Dallaswhite, this evidence in part stems from Arthur's November 24 email to Whiteway that she was "now in charge of the Big Bear Property"; and from her trial testimony that, before sending the November 24 email to Whiteway, she read it to Mary who approved it. According to Dallaswhite, the "only reasonable conclusion" from this evidence is that Mary

---

14    All further undesignated statutory references are to the Civil Code.

"had no objection to, and agreed with [Arthur] taking control over the project." We reject this contention for a number of reasons.

First, Dallaswhite applies the wrong legal test in support of its claim of error. The question is not whether there is record evidence to support an agency finding contrary to the one made by the court. (See *Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195 (*Eidsmore*) [on substantial evidence review we "will not reweigh evidence, reappraise the credibility of witnesses, or resolve factual conflicts contrary to the trial court's findings, but only decide whether there is substantial evidence to support these findings"].) Instead, the question for our review is whether Dallaswhite's evidence compels a finding of agency in its favor. (See *Estes*, *supra*, 51 Cal.App.5th at p. 651.)

Second, we conclude Dallaswhite on appeal has not shown the evidence compels a finding Arthur was the *actual* agent of her parents. (See § 2299.) At the 2015 Trial De Novo, both Mary and Edward testified they never authorized Dallaswhite, and Riehm in particular, to take "instruction" from Arthur regarding the Project. Although Riehm during the Trial De Novo accused Mary and Edward of "lying," on further questioning they both reiterated that neither of them had consented to Arthur having the "authority" or "power" to modify the Project. The court as trier of fact in the instant case was not required to believe Riehm. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67 (*Stevens*) [noting it is the "province of the [trier of fact] to resolve the conflicts in the evidence and to pass upon the weight to be given the evidence"].)

In addition, Mary in discovery responses stated that she never authorized Arthur to "manag[e] the reconstruction at the Subject Property";

21

that Patrick was the "only person" who had such authority; and that neither she nor her husband "revoked" Patrick's "written authority" to do so.

But that's not all. At trial in the instant case, Mary testified she never authorized Arthur to send the November 24 email to Whiteway. Moreover, Mary reiterated that she never consented to Arthur being in "charge of the Big Bear property" and that Arthur had "no authority to make any decisions" on her behalf.

Arthur's November 24 email to Whiteway also supports the court's agency finding. (See *Brewer, supra*, 161 Cal.App.4th at pp. 935-936.) In that email, Arthur informed Whiteway that Mary was "*not fit to make any decisions*" as a result of her suffering from shingles, which had left Mary bedridden for weeks. (Italics added.) Arthur in her trial testimony confirmed Mary was "very sick" in November 2013 and thereafter, and "wasn't really physically well enough to make decisions about rebuilding a house," testimony Mary herself confirmed at trial.

Further support for the court's agency finding is evidence that Arthur disagreed with Patrick's handling of the reconstruction Project. This evidence supports the inference that she took over the Project to save her parents money, as she believed her brother was turning what was a rental property into a "5 star resort."

Moreover, that Arthur believed she had "authority" to manage the Project and alter the scope of work and contract is not determinative. (See *South Sacramento Drayage Co. v. Campbell Soup Co.* (1963) 220 Cal.App.2d 851, 856-857 [finding "the fact of belief is not enough" to create an agency as there must be a showing that the belief was "engendered by conduct of the principal," and noting to hold otherwise "would give any agent, not the authority, but the naked power to bind his principal to any contract within

22

the general scope of duties, however fantastic or detrimental to the principal's interest such contract may be"].)

Nor is the fact that Arthur was the daughter of the Mowbrays decisive on agency. (See, e.g., *Valentine v. Plum Healthcare Group, LLC* (2019) 37 Cal.App.5th 1076, 1089 (*Valentine*) [noting an agency relationship "cannot be implied from the marriage relationship alone," and concluding the patient's husband was not her agent, despite *his* reasonable belief otherwise, when he signed admission documents on his wife's behalf that required any claims against the defendant skilled nursing facility to be arbitrated]; *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 572 [" 'fact that parties had a preexisting relationship is not sufficient to make one party the agent for the other' "].)

In sum, we conclude the finding that no actual agency existed between Arthur and her parents is supported by substantial evidence (see *Brewer*, *supra*, 161 Cal.App.4th at pp. 935-936); and therefore, that Dallaswhite on appeal cannot show the evidence compels an opposite finding (see *Estes*, *supra*, 51 Cal.App.5th at p. 651).

Third, we conclude the evidence also does not compel a finding that Arthur was the *ostensible* agent of the Mowbrays. (See § 2317.) "Ostensible agency cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the belief the agency exists." (*Valentine*, *supra*, 37 Cal.App.5th at p. 1087; see *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 747 [" ' "Liability of the principal for the acts of an ostensible agent rests on the doctrine of 'estoppel,' the essential elements of which are representations made by the principal, justifiable reliance by a

23

third party, and a change of position from such reliance resulting in injury" ' "].)

Here, at a minimum the evidence is controverted whether the conduct of the Mowbrays engendered the belief on the part of Dallaswhite that Arthur had the authority to orally modify R-3. (See *Valentine*, *supra*, 37 Cal.App.5th at p. 1087.) As we have already noted, the evidence shows neither Mary nor Edward were in a position at or near the time Arthur wrote the November 24 email, or thereafter, to convey to Dallaswhite a shared belief they approved of Arthur modifying the Project.

The instant matter is also unlike those cases in which an ostensible agency was found to exist based on the parties' past behavior, or prior relationship or course of conduct. (See, e.g., *Leavens v. Pinkham & McKevitt* (1912) 164 Cal. 242, 245-249 [concluding manager was packing house's ostensible agent to purchase fruit based on his prior authorized purchases from plaintiff and others and the company's failure to indicate in any manner the manager lacked authority in those instances, given the manager was the defendant's "sole representative . . . in that locality," was "acting within the scope of a general employment to represent defendant in its business at that place, and such business included . . . the purchase of fruit"]; *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 408-409 [ostensible agency existed where insurance agent had previously bound insurer to issue insurance 30 to 40 times despite express agreement denying an agency relationship, and where insurer "never objected to that practice"]; *Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 435-437, 439 [insurance wholesaler was carrier's ostensible agent where insurance broker had historically filed claims with wholesaler].) Here, no prior relationship or course of dealing existed between Arthur and Dallaswhite to

24

support the inference it held a reasonable belief she was the agent of the Mowbrays.

In fact, the evidence is to the contrary. As noted, Whiteway in his *initial* email to Arthur asked her to provide a power of attorney "ASAP." Whiteway's request for a power of attorney further supports a finding that he, as president and owner of Dallaswhite, wanted assurance that Arthur had the requisite authority from her parents to take over the Project and bind them to changes to R-3.

This evidence is more than sufficient to support the finding that Arthur was not the ostensible agent of the Mowbrays. (See *Brewer*, *supra*, 161 Cal.App.4th at pp. 935-936.) While there was evidence that *could* have supported a contrary finding, the court as trier of fact was entitled to weigh the evidence and consider the witnesses' credibility (or lack thereof), which is binding on this court under the appropriate standard of review. (See *Eidsmore, supra*, 25 Cal.App.4th at p. 195; see also *Estes*, *supra*, 51 Cal.App.5th at p. 651.)

Fourth, for similar reasons we conclude the evidence does not compel a finding that the Mowbrays adopted or *ratified* as their own the acts of Arthur in modifying R-3 and the contract. (See *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73 [" 'Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him' "]; see also § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification"].)

As summarized *ante*, Mary unambiguously testified she never would have signed the Certificate of Completion on January 30, 2014, as

25

Dallaswhite had neither made the agreed-to upgrades requested by Patrick nor completed to her satisfaction its reconstruction work under the contract. Mary made her feelings known to Whiteway in June 2014, after her *first* visit to the Subject Property. She testified at the Trial De Novo she was "appalled" by the quality of Dallaswhite's work, as was Edward, who, according to Mary, had called Dallaswhite "innumerable times leaving messages" regarding his concerns over the Project.

Moreover, at the Trial De Novo Edward testified that, when he signed the Certificate of Completion, he was "incapacit[ated]"; that as a result, he was unable to climb the stairs to the second floor to make a "good inspection"; that he thus felt "unqualified" to sign the Certificate of Completion but did so at the urging of Riehm; that he then was unaware of the terms of the Project Patrick had negotiated, which included myriad upgrades priced into the contract; and that, had he known what should have been installed in the Subject Property, he never would have signed the Certificate of Completion. The court credited this evidence when it rejected Dallaswhite's contention that Edward's signature on the Certificate of Completion excused its failure to obtain a proper change order for Arthur's downgrade of the Project.[15]

From the foregoing, we conclude substantial evidence supports the finding that the Mowbrays did not ratify Arthur's modification of R-3, such that her acts would be treated as their own. (See *Brewer*, *supra*, 161 Cal.App.4th at pp. 935-936.) Such evidence precludes an agency finding

---

[15] The court also credited evidence showing the Certificate of Completion was merely a requirement by Farmers for "release of the balance of reimbursement owed to the Mowbrays." The court therefore found the "Certificate of Completion . . . does not represent an agreement to modify the contract, which, by its terms, could only be done in the particular form specified in the contract [i.e., Section 6]."

26

based on ratification in favor of Dallaswhite as a matter of law. (See *Estes*, *supra*, 51 Cal.App.5th at p. 651.)

Dallaswhite nonetheless contends Mary ratified Arthur's conduct based on Arthur's trial testimony that, before she sent the November 24 email to Whiteway, she cleared it with Mary. However, as noted *ante*, Mary disputed that she authorized Arthur to send Whiteway this email, and that she had ever authorized Arthur to take control of, and modify, the Project. As trier of fact, the court was entitled to believe Mary and not Arthur. (See *Stevens*, *supra*, 9 Cal.3d at p. 67.)

Dallaswhite also references a meeting at the Mowbrays' Orange County home on January 16, 2014 (the day before Edward gave Riehm the cashier's check). This meeting was attended by Mary, Edward, Arthur, and Riehm. According to Dallaswhite, during the meeting the Mowbrays "reviewed the finished work with Mr. Riehm." "The Mowbrays unquestionably knew about the cabinets, appliances, floors, paints, and other materials selected and installed at the Subject Property . . . and *approved* them." (Italics added.)

However, in her deposition Arthur testified that Mary was experiencing "terrible headaches" and other severe health problems during the January 16 meeting; and that, while Arthur attempted to include her mother in the meeting, because Mary was "so sick, . . . she might not have made the decision that she would make when she was well."

Arthur also testified at her deposition that, because Edward was "hard of hearing," she had to go back and forth between Riehm and her father during the January 16 meeting, as Riehm was showing "pictures of what *he* had picked out" based on changes to R-3 unilaterally made by Arthur. (Italics added.) According to Arthur, her father then agreed to downgrade the

27

Subject Property, including the proposed changes to the kitchen appliances and cabinets among other modifications.

But Edward at the Trial De Novo testified differently, stating he never agreed to these changes and, in fact, did not even know what was called for in the scope of work and the various change orders when confronted with these changes during this meeting. (See *Stevens*, *supra*, 9 Cal.3d at p. 67 [it is the "province of the [trier of fact] to resolve the conflicts in the evidence"].) This substantial evidence supports the finding that neither Mary nor Edward ratified Arthur's decision to modify R-3.

**B.** *Executed Oral Agreement*

As noted, Section 6 of the contract required all changes to the scope of work be in writing on the change order form attached as an exhibit to the contract. As also noted, before Arthur's involvement in the Project in late November 2014, the parties' course of conduct had been to follow this Section, as evidenced by Change Orders 1, 3, 4, and 5.

Dallaswhite nonetheless contends the court erred in refusing to apply section 1698, subdivision (b), which provides: "A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties." Whether a writing has been modified by an executed oral agreement is a question of fact. (*Eluschuk v. Chemical Engineers Termite Control, Inc.* (1966) 246 Cal.App.2d 463, 469 (*Eluschuk*).) "[T]he effect [of an executed modification] is to alter only those portions of the written contract directly affected by the oral agreement leaving the remaining portions intact." (*Ibid.*)

We find Dallaswhite's contention unavailing.

First, it improperly presumes that Arthur was the agent of her parents, and thus, she was authorized to orally modify the contract.

28

Second, because Arthur was not the agent of the Mowbrays, she had no authority to waive the requirement in Section 6 of the contract that changes to the scope of work be in writing. Waiver of a contractual right is ordinarily a question of fact to be determined by the trier of fact. (See *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 679 (*Old Republic*).) "In the case of a true waiver implied in fact from conduct, the intent to waive must be clearly manifested or the conduct must be such that an intent to waive may be reasonably inferred." (13 Williston Contracts (4th ed. 2015) § 39:28, p. 625, fns. omitted [waiver of contract rights may be express or implied through conduct].)

Here, prior to Arthur's involvement, as we have noted the changes to R-3 were all in writing. The parties' course of dealing is thus contrary to a finding of implied waiver of Section 6, as the trial court recognized when it found Arthur "had no legal authority to modify the contract, which could only be done by Mr. or Mrs. Mowbray or Patrick, in writing, as specified in the contract."

Third, the court expressly considered and rejected the theory that there was an executed oral agreement between the parties. It noted the "existence of the forged Change Order 6 belies the possibility of [such an] oral agreement," adding: "[I]f there was an executed oral agreement between the parties, there would be no need [of Dallaswhite] to forge a signature on Change Order 6." We agree with this reasoning, and for this separate reason reject the argument the oral modification to R-3 was enforceable against the Mowbrays. (See *Eluschuk, supra*, 246 Cal.App.2d at p. 469.)

## C. *Waiver and Estoppel*

Dallaswhite next contends the court failed "to address the substantial evidence that show[s] the Mowbrays knew and agreed to [Arthur] taking

control from Patrick in the management of repairs to the Subject Property." It further contends this evidence supports a finding of waiver and/or estoppel in its favor.

"Under California law, a waiver is the intentional relinquishment or abandonment of a known right or privilege." (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1506 (*Smith*); see *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 487 ["The essence of waiver . . . is the voluntary relinquishment of a known right."].) And, as noted, waiver is a question of fact and is based on intent. (*Old Republic, supra,* 80 Cal.App.4th at p. 679.) The intent to waive may be expressed in words, either oral or written, or implied by a party's conduct. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)

Here, as we have repeatedly noted, there is ample evidence to support a finding that Mary never expressly or impliedly "agreed" to allow Arthur to take over and modify the Project, as Mary testified at her deposition, the Trial De Novo, and the trial in the instant case. Edward's testimony at the Trial De Novo was similar to Mary's, as also summarized *ante.*

Moreover, as we have also noted, substantial evidence supports the court's finding that both Mary and Edward were unable to make decisions regarding the Project at or near the time Arthur sent the November 24 email to Whiteway; and that neither of them were aware of the terms of the contract Patrick had negotiated, as reflected in R-3 and the change orders, including when Edward signed the Certificate of Completion on January 30, 2014 (as he so testified at the Trial De Novo). (See *Brewer, supra,* 161 Cal.App.4th at pp. 935-936.)

The record also shows that shortly after the walk-through, which neither Mary or Patrick attended, both Mary and Edward contacted

Dallaswhite to complain about the renovation. This evidence is further support for the finding that the Mowbrays did not expressly or impliedly waive or relinquish any claim against Dallaswhite for *its* decision to follow Arthur's instructions to orally modify R-3. (See *Smith*, *supra*, 164 Cal.App.4th at p. 1506.)

We also find the evidence does not support a finding that the Mowbrays' were estopped from asserting Arthur's lack of authority to modify R-3. " 'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be . . . acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359 (*Feduniak*).) The existence of an estoppel is generally a factual question. (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 266.)

We conclude equitable estoppel does not apply in this case because at a minimum, substantial evidence supports a finding the Mowbrays were not "apprised of the facts" regarding the Project itself and Arthur's changes to it. (See *Feduniak*, *supra*, 148 Cal.App.4th at p. 1359.) The court found Mary was unaware of the changes to the contract until she visited the Subject Property in June 2014, as she was "not directly involved in the project, and there is no evidence she knew anything about the details of R-3."

Similarly, Edward also did not know the scope of changes to the Project made by Arthur and Dallaswhite, as he testified at the Trial De Novo, given he, like his wife, was not involved in the negotiation of the contract or the agreed-to scope of work. Moreover, at the time Arthur took over the Project,

31

and thereafter until its completion in late January 2014, Edward was "incapacitated."

Patrick also testified at the Trial De Novo that while Mary held the "checkbook," *he* ran the "job"; that he told Whiteway neither Mary nor Edward wanted *any* involvement in the Project; and that Whiteway in response confirmed Dallaswhite would "correspond and deal directly" with Patrick as it had "from the beginning."

This evidence is more than sufficient to support a finding that the Mowbrays were not "apprised of the facts" of the Project, including the changes to it after Arthur took over; and therefore, that they were not estopped from asserting Arthur's lack of authority. (See *Feduniak*, *supra*, 148 Cal.App.4th at p. 1359.)

Dallaswhite also argues that estoppel should apply based on the maxim, "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." (§ 3543.)[16] Dallaswhite argues the court erred "in failing to consider the substantial evidence" that it "acted *innocently* in following what it was led to believe were the Mowbrays' wishes." (Italics added.)

Again, Dallaswhite misconstrues the standard of review we must apply. (See *Brewer*, *supra*, 161 Cal.App.4th at pp. 935-936; *Estes*, *supra*, 51 Cal.App.5th at p. 651.) In any event, as discussed *ante* the court found *someone* at Dallaswhite forged Edward's signature on Change Order 6, which attempted to memorialize in R-4 the oral modifications made by Arthur and Dallaswhite to R-3. And as also discussed, Dallaswhite did not contest this finding on appeal. That someone at Dallaswhite forged Edward's signature

---

16     Dallaswhite states this maxim a little differently, without citation to section 3543.

32

on this change order in an attempt to create a new scope of work, is strong evidence that Dallaswhite was not an "innocent" party in this case. (See § 3543.)

### III. Remaining Contentions

#### A. *Statute of Limitations*

Dallaswhite contends the court erred in finding the four-year statute of limitations in Code of Civil Procedure section 337.1 was inapplicable to Mary's breach of contract claim, which she filed against Dallaswhite on January 22, 2018.

#### 1. Guiding Principles

Section 337.1, subdivision (a) of the Code of Civil Procedure provides in relevant part: "Except as otherwise provided in this section, no action shall be brought to recover damages from any person performing or furnishing the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to real property more than four years after the substantial completion of such improvement for any of the following: [¶] (1) Any patent deficiency in the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to, or survey of, real property; [¶] (2) Injury to property, real or personal, arising out of any such patent deficiency." (Code Civ. Proc., § 337.1, subd. (a)(1)-(3).)

Subdivision (e) of Code of Civil Procedure section 337.1 defines "patent deficiency" to mean "a deficiency which is apparent by reasonable inspection." (Code Civ. Proc., § 337.1, subd. (e).)

"Resolution of the statute of limitations is normally a question of fact." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810 (*Fox*); see *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [same].)

33

### 2. **Analysis**

For Dallaswhite to prevail on its contention Code of Civil Procedure section 337.1, subdivision (a) barred Mary's breach of contract claim, it must show as a matter of law that Mary's cause of action accrued on or before January 21, 2014. (See *Fox, supra,* 35 Cal.4th at p. 810.)

As noted, Arthur was not the agent of her parents and thus, any knowledge on her part regarding changes she made to the contract *cannot* be imputed to Mary. (See § 2332 ["As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other"]; *Estate of Cantor* (1974) 39 Cal.App.3d 544, 549 ["The law imputes knowledge of the agent . . . to the principal."].)

The court found Mary did not learn of the changes to the contract until June 2014, within four years of filing her lawsuit, when she first visited the Subject Property. Moreover, the record shows her husband Edward did not sign the Certificate of Completion until January 30, 2014, again within four years of his wife's lawsuit against Dallaswhite.

Dallaswhite nonetheless argues the statute of limitations commenced on January 16, 2014, when Riehm came to the Mowbrays' Orange County home and during a meeting showed the Mowbrays "photos of the job status" of the Project. According to Dallaswhite, any defects and deficiencies to the Project then would have been readily "apparent by reasonable inspection" of the "photos," inasmuch as the "majority of defects" complained about were "visible to the naked eye."[17] (See Code Civil Proc., § 337.1, subd. (e).)

---

[17] Dallaswhite in its AOB did not identify these "photos" or give a record cite for our review.

34

But as noted, during the January 16 meeting Mary was still "very sick" and unable to make any decisions regarding the Project. The court also found Mary then was unaware of the terms of the contract, as we also have noted. This evidence precludes a finding as a matter of law in favor of Dallaswhite that the applicable statute of limitations commenced to run on January 16, 2014.

Dallaswhite also argues Patrick, as his parents' agent, knew in early June 2013 that Dallaswhite was in breach of the contract when he complained of substantial delays in the Project; and his knowledge is imputed to Mary. (See § 2332.) But the court found R-3, adopted by Change Orders 1 and 3, was not in existence when Patrick complained to Dallaswhite about the delay. Moreover, the "breaches" to the contract found by the court were "not based on delay." And we add that, in June 2013, the Project also was not "substantial[ly] complet[ed]" as required under subdivision (a) of Code of Civil Procedure section 337.1.

We therefore reject Dallaswhite's contention the court erred in refusing to find the applicable statute of limitations barred Mary's breach of contract claim.

## B. *Denial of Leave to File a Cross-complaint Against Arthur*

Dallaswhite contends the court erred in denying its motion for leave to file what it contended was a compulsory cross-complaint against Arthur, citing to Code of Civil Procedure section 426.10. As noted *ante*, Dallaswhite brought its motion in late April 2019, claiming it had just learned from Mary's discovery responses that she was disputing Arthur's authority to manage the Project, including changing the terms of the contract negotiated by Patrick.

At a May 10 hearing, the court denied Dallaswhite's motion. The court found the cross-complaint was permissive and not compulsory; the indemnity and contribution claims Dallaswhite sought to assert against Arthur had not accrued because no judgment had been rendered against Dallaswhite; and Arthur would suffer "significant prejudice" if its motion was granted because trial was set to commence the following month.[18]

On appeal, Dallaswhite contends the court erred because its complaint against Arthur was compulsory, and there was no showing of bad faith on its part. We disagree.

### 1. Guiding Principles

Code of Civil Procedure section 426.30 governs compulsory cross-complaints. Subdivision (a) of this statute provides in relevant part: "[I]f a party against whom a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the *plaintiff*, such party may not thereafter in any other action assert against the *plaintiff* the related cause of action not pleaded." (Code Civ. Proc., § 426.30, subd. (a), italics added.)

Code of Civil Procedure section 428.10 governs permissive cross-complaints. It provides in relevant part: "A party against whom a cause of action has been asserted . . . *may* file a cross-complaint setting forth [¶] . . . [¶] (b) Any cause of action he has against *a person* alleged to be liable thereon, *whether or not such person is already a party to the action*, if the cause of action asserted in his cross-complaint (1) arises out of the same

---

18    The court noted its ruling did not prevent Dallaswhite from filing a separate action against Arthur, or waiting for the appropriate time to seek indemnity and/or contributions from her, depending on the outcome of Mary's lawsuit.

36

transaction, occurrence, or series of transactions or occurrences as the cause brought against him." (Code Civ. Proc., § 428.10, subd. (b), italics added.)

## 2. Analysis

We conclude as a matter of law that, because Arthur was not a "plaintiff" in Mary's action (see Code Civil Proc., §426.30, subd. (a)), Dallaswhite's proposed cross-complaint against Arthur was permissive and not compulsory, inasmuch as it arose out of the "same transaction" or "occurrence" as the "cause brought against [Dallaswhite]." (See § 428.10, subd. (b); see *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572 [a " 'statute's plain meaning controls the court's interpretation unless its words are ambiguous,' " and " '[i]f the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent' "].)

Code of Civil Procedure section 428.50 governs the timing of the filing of a permissive cross-complaint. As relevant here, subdivision (b) of this statute provides a party may file a cross-complaint against a third party "at any time before the court has set a date for trial." (Code Civ. Proc., § 428.50, subd. (b).) However, if a party fails to file a cross-complaint against a third party before the date set for trial, as was the case here, the party "shall obtain leave of court to file any cross-complaint" (*id.*, subd. (c)); and "[l]eave may be granted in the interest of justice at any time during the course of the action" (*ibid.*). "Permission to file a permissive cross-complaint is solely within the trial court's discretion." (*Crocker Nat. Bank. v. Emerald* (1990) 221 Cal.App.3d 852, 864 (*Crocker*); see *Orient Handel v. United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 701 [same].)

We conclude the court did not abuse its discretion in denying Dallaswhite's motion. Dallaswhite's explanation for its delay in seeking permission to file the cross-complaint ignores Mary's testimony from the

37

April 2015 Trial De Novo that Arthur had no "authority" to manage the Project. Riehm appeared at the Trial De Novo on behalf of Dallaswhite, testified, and cross-examined Mary and Edward. During this proceeding, he even accused Mary and Edward of "lying" when each denied representing to him that Arthur had control of the Project. Thus, Dallaswhite knew Mary disputed Arthur's authority about *four years before* it sought to file its cross-complaint.

Under these circumstances, we conclude the court acted well within its discretion in denying Dallaswhite leave to file its cross-complaint on the eve of trial. (See *Crocker*, *supra*, 221 Cal.App.3d at p. 864.)

## C. *Damages*

### 1. Additional Background

In awarding Mary damages for Dallaswhite's breach, the court primarily relied on the trial testimony of Mary's expert witness, David Spiegel, who also had conducted the CSLB investigation of Dallaswhite in 2014. The court found Spiegel to be "knowledgeable," "well-qualified," and "credible," and noted Dallaswhite offered no expert testimony to counter his opinions. Accepting Speigel's opinions "in full," the court determined the "cost of corrective measures" to the Project totaled $39,593.64.

The court also found that there were certain items called for in R-3 that Dallaswhite failed to provide, as credibly testified to by Mary; and that Whiteway admitted a small number of items included in R-3 were "duplicate charges listed in error." Together, when combined with charges for "tax, overhead, and profit" on these items, they totaled $3,861.75, for a damage award of $43,455.39.

The court next turned to setoffs. It found Mary received $4,978.90 from Dallaswhite pursuant to a settlement with the CSLB, after the agency had

cited Dallaswhite, assessed a penalty, and ordered restitution to the Mowbrays. The court also found Mary received $7,500 under Dallaswhite's construction bond. Finally, the court found $14,172.92 remained unpaid under R-3, as adjusted by Change Orders 1, 3, 4, and 5. Applying the total setoff of $26,652.82 to Mary's damages of $43,455.39, the court awarded her compensatory damages of $16,803.57.

### 2. Failure to Mitigate

Dallaswhite contends the court erred in awarding Mary's damages because *she* "offered no evidence to show she took steps to mitigate [her] damages." But the burden of pleading *and proving* a defense based on a plaintiff's failure to mitigate is on the defendant. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043, 1049; see *Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267, 1284 [recognizing "mitigation is an affirmative defense"]; Evid. Code, § 500 ["Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."].)

It was therefore *Dallaswhite's* burden to proffer evidence that Mary failed to mitigate her damages, including—as Dallaswhite argues—by making repairs to the Subject Property sooner rather than later "so as to avoid the increased cost of goods and materials resulting from inflation." We thus reject Dallaswhite's contention the court should have reduced Mary's damage award (by some number) based on *her* failure to show she mitigated damages.

### 3. The March 2014 Supplemental Invoice

Dallaswhite contends the court erred in refusing to offset from Mary's damages the $5,675.49 payment the Mowbrays received in 2014 from

Farmers that was the subject of the Trial De Novo, discussed *ante*. Dallaswhite contends the court erred in finding the collateral source rule prevented this offset because this money was paid directly to the Mowbrays by their insurer.  We agree.

Under the collateral source rule, "[w]here a person suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer." (*Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 349; see *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 ["The Supreme Court of California has long adhered to the doctrine that if an injured party receives some compensation for his injuries from a source wholly independent of the *tortfeasor*, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the *tortfeasor*" (italics added).].)

The "overwhelming weight of authority in California and other jurisdictions has rejected the extension of the collateral source rule to breach of contract.  [Citations.]  This limitation is traceable to the fundamental differences between recovery in contract and tort.  [¶]  ' "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable.  [Citations.] . . . ."  [Citation.]  "In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered." ' " (*Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 108 (*Plut*).)

Here, the court awarded Mary compensatory damages against Dallaswhite for breach of contract.  The record shows the March 2014

40

Supplemental Invoice related to costs incurred by Dallaswhite in its performance of the contract. Although Mary also asserted a negligence cause of action against Dallaswhite, the court found against her on this claim. Given Mary's recovery was " 'limited to damages based on [her] *actual loss* caused by the breach,' and [her] recovery is reduced if the losses are avoided or mitigated." (see *Plut*, *supra*, 85 Cal.App.4th at p. 108, italics added), we conclude Dallaswhite is entitled to an additional offset of $5,675.49.

### 4. The Laundry Room

Finally, Dallaswhite contends it is entitled to a further offset for its work in installing a laundry room in the Subject Property, a cost estimated by Whiteway to have been about $12,000. The court, however, found that Dallaswhite agreed to install the laundry room at " 'no charge' due to other set-offs"; that any agreement regarding the laundry room "should have been," but was not, "properly documented" by Dallaswhite; and perhaps most importantly, that "Dallaswhite failed to present any credible evidence of the enhanced value of the cabin by virtue of the addition." The court added, "Although [it] found Mr. Whiteway to be a credible witness in general, his testimony on this particular subject—the value of the laundry room—was wholly unbelievable."

On review, we are bound by the credibility determinations made by the trier of fact. (See *Schmidt*, *supra*, 44 Cal.App.5th at 582; *Cuiellette*, *supra*, 194 Cal.App.4th at p. 765; *Pescosolido*, *supra*, 142 Cal.App.3d at p. 970.) Moreover, the issue of the amount of damages is a matter for determination by the trier of fact, and we will "not question the discretionary determinations of jury and judge, so long as they fall within a reasonable range permitted by the evidence." (*Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 857.) On this record, there is no basis to disturb the

court's decision refusing to award Dallaswhite an additional offset for its construction of the laundry room.[19]

## DISPOSITION

The $16,803.57 in compensatory damages awarded to Mary is reduced by $5,675.49 as a result of the Mowbrays' retention of the payment from their insurer in 2014.  The trial court is directed to enter a new judgment for Mary, awarding her damages of $11,128.08.  In all other respects, the judgment is affirmed.  Mary to recover her costs of appeal.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

---

[19]    At various points in its AOB, Dallaswhite contends the court erred in refusing to consider its objections to the tentative statement of decision because the court found them untimely.  We have reviewed those objections and find Dallaswhite suffered no resulting prejudice, as the issues raised therein were either considered by the court in issuing its SOD (as revised), or have been considered and disposed of on the merits in this appeal.